IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

USA SATELLITE & CABLE, INC.,    )
         )
         )
    Plaintiff,    )    09 C 2067
         )
    v.    )    Judge Ronald A. Guzmán
         )
         )
NORTH AMERICAN CABLE EQUIPMENT,    )
INC.,    )
         )
         )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff USA Satellite & Cable, Inc. ("USA Satellite") brought suit against defendant North American Cable Equipment, Inc. ("NACE") for breach of contract. Plaintiff contends that defendant failed to make commission payments to plaintiff under two types of agreements regarding satellite television programming services. Plaintiff further asserts that NACE wrongfully refuses to transfer USA Satellite's properties to another vendor that will pay commissions. Before the Court is plaintiff's motion for summary judgment. For the reasons set forth below, the Court denies in part and grants in part the motion.

It is not clear from the pleadings, briefs or statement of facts the relationship between the parties involved in the current dispute. From what the Court can gather, DirecTV provides cable satellite service to multiple dwelling units ("MDUs") through Master System Operators, such as North American Cable Equipment, Inc. ("NACE"). (Ex. 12, DirecTV MDU Master System Operator Agreement at 1.) DirecTV pays NACE to: (1) establish, manage and maintain for

DirecTV a network of System Operators, such as USA Satellite, who install satellite television

cable infrastructure at MDUs; and (2) solicit residential MDU customers for DirecTV. (*Id.*)

Practically speaking, the only way NACE can typically solicit residential MDU customers for

DirecTV is through System Operators, such as USA Satellite, who enter exclusive right-of-entry

agreements with property managers of residential MDUs to: (1) chose a satellite cable provider,

such as DirecTV on behalf of the MDU; and (2) install and maintain satellite cable television

infrastructure. (*Id.*)  In sum, DirecTV pays NACE to manage and solicit business from

residential MDUs on its behalf and ensure that such MDUs have the proper infrastructure to

receive satellite cable service.  NACE solicits business for DirecTV through USA Satellite

because USA Satellite has an exclusive agreement with residential MDUs to install satellite cable

infrastructure at, and order cable service for, the MDU.

### Facts

To the extent USA Satellite's statements of facts are supported by the record they are

deemed admitted due to NACE's failure to provide a response to the movant's statement of facts

including, in the case of any disagreements, specific reference to the record supporting such

disagreements as required under Local Rule 56.1(b). *See, e.g., Jackson v. Carpenters Local

Union #1*, No. 02-C-9091, 2004 WL 2191584, at *2 (N.D. Ill. Sept. 24, 2004) (holding that

failure to provide a response constitutes an admission of the movant's version of the facts).

However, a nonmovant's failure to . . . comply with Local Rule 56.1, does not . . . automatically

result in judgment for the movant. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir.

2006) (citations omitted).  Instead, [t]he ultimate burden of persuasion remains with [the movant]

to show that it is entitled to judgment as a matter of law. *Id.* (citation omitted).

USA Satellite provides satellite television programming services to buildings containing multiple living units throughout Chicago. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 4.) USA Satellite typically obtains right-of-entry agreements from property owners that give USA Satellite the exclusive right to install, maintain and service satellite television programming services ("USA Satellite properties"). (Compl. ¶ 3.) These agreements give USA Satellite the exclusive right to select (for the property) a programming provider such as DirecTV and a Master System Operator such as NACE or Skynet, Inc. ("Skynet"), which provides satellite television equipment. (*Id.* ¶ 4.)

On January 15, 2005, USA Satellite and NACE entered into an agreement called a Multi-Dwelling Unit Master System Operator Agreement ("MDU Agreement"). (Pl.'s LR 56.1(a)(3) Stmt. ¶ 7.) The MDU Agreement provides that NACE is obligated to compensate USA Satellite in the form of ongoing commissions and other payments for, among other things, USA Satellite's investment in buying, installing and maintaining satellite television equipment for the buildings in which it maintains a right-of-entry agreement. (*Id.* ¶ 9.) The MDU Agreement terminated on January 14, 2010, but the parties continued to perform under it thereafter. (*Id.* ¶ 19.)

Under the MDU Agreement, NACE is obligated to pay USA Satellite for activating two types of programming packages: (1) Digital Direct-to-Home programming and (2) Digital Bulk programming. (*Id.* ¶ 22.) Each package pays two types of commissions: (1) a residual commission or continuing service fee, and (2) a prepaid programming commission ("PPC"). (*Id.*) DirecTV also pays NACE a residual commission and PPC. (*Id.*) The commission structure is summarized below:

| Type of Commission | NACE Commission Paid by DirecTV | USA Satellite Commission Paid by NACE |
|---|---|---|
| Residual Commission for Direct-to-Home Programming Packages | 25% of DirecTV's Net Receipts | 15% of DirecTV's Net Receipts |
| Residual Commission for Digital Bulk Programming Packages | 19% of DirecTV's Net Receipts | 15% of DirecTV's Net Receipts |
| Prepaid Programming Commission for Direct-to-Home Programming Packages | $175 per activation after May 25, 2007 | $50 per activation before March 29, 2007 $80 per activation after March 29, 2007 |
| Prepaid Programming Commission for Digital Bulk Programming Packages | $200 per activation | $35 per activation |

(*Id.*) The MDU Agreement defines Net Receipts as "gross receipts actually received by DirecTV from the sale of Commissionable Programming Packages during the Term, net of any discounts, refunds, fees, credits, taxes or applicable governmental charges (other than income or franchise taxes) related to the sale, order or use of such Commissionable Programming Packages." (*Id.* ¶ 24.)

## A.     Residual Commissions for Direct-to-Home and Digital Bulk Programming Packages

Under the MDU, residual commissions for both Direct-to-Home and Bulk Programming packages are calculated as follows: "[NACE] will pay [USA Satellite] a monthly continuing service fee on a per SO Subscriber [equal to]: 15% of Net Receipts received by DirecTV from active S[O] Subscribers Commissionable Programming Packages, solely with respect to those Net Receipts received by DirecTV while this Agreement is in effect." (*Id.* ¶ 23.) Mary Rouse, the account representative for NACE responsible for calculating commissions and other payments due to USA Satellite, testified that the Net Receipts received by DirecTV for both Direct-to-Home and Digital Bulk programming packages are disclosed in a report called the "Dealer Detailed Commission Report." (*Id.* ¶ 25.) Rouse testified that NACE used the service price from these reports to calculate the Net Receipts in order to determine the residual

4

commissions payable to USA Satellite. (*Id.*) Between May 2005 and December 31, 2009, the

Net Receipts for the USA Satellite properties amounted to $954,471.78. (*Id.* ¶ 27; Pl.'s Sched.

10, Net DirecTV Receipts from USA Satellite, at 10.) Based on a fifteen percent commission

rate, plaintiff's damages expert, Allen Jacque, testified that the Residual Commissions for both

the Direct-to-Home and Digital Bulk programming packages amounted to $143,170.77 from

May 2005 through December 2009.[1] (Pl.'s LR 56.1(a)(3) Stmt. ¶ 27; Pl.'s Sched. 9, Summ.

Residual Comm'ns, at 2.)

## B.   PPCs for Direct-to-Home Programming Packages

Payment of PPCs for Direct-to-Home programming packages is described in the MDU

Agreement, in part, as follows:

> [NACE] will pay [USA Satellite] a prepaid programming commission in the
> amount of fifty dollars ($50.00) the "Standard PPC" for each activation of
> Commissionable Programming Package for S[O] Subscribers . . . . [I]n the event
> an order on which such a PPC is paid is terminated, canceled or disconnected
> (whether initiated by the SO Subscriber or DirecTV) in fewer than 12 months or
> the SO, Subscriber fails to pay DirecTV for the entire twelve-month period of a
> Commissionable Programming Package, [NACE] shall have the right to charge
> [USA Satellite] back (or deduct from any Commissions otherwise payable to
> [USA Satellite]) a portion of such PPC, prorated to reflect the portion of the 12

---

[1] Defendant argues that plaintiff's expert, Allen Jacque, is not qualified to testify on the issue of damages because he is not a Certified Public Accountant ("CPA"). Jacque has a bachelor's degree in Economics and Finance from the University of Wisconsin—La Crosse and a Master of Science Degree in Economics from Marquette University. (Jacque Decl. ¶ 49.) He is a Certified Financial Analyst ("CFA") and a Certified Fraud Examiner. (Pl.'s Ex. 2, Expert Report of Allen Jacque, App. A.) His undergraduate and graduate coursework covered financial accounting, as well as, managerial accounting topics. (Jacque Decl. ¶ 54.) For the past fourteen years, he has worked for firms that specialize in the calculation of damages, dispute analysis and litigation support. (*Id.* ¶¶ 49-54.) Specifically, since 2006 he has been a Senior Manager of Blackman Kallick, LLP's Forensic and Litigation Services practice. (*Id.* ¶ 51.) Jacque testified to his having extensive experience in consulting in the field of forensic and economic damages in litigation, calculating damages and performing forensic accounting and computing insurance related losses for purposes of litigation including two engagements specifically pertaining to the calculation of unpaid/underpaid commissions. (*Id.* ¶¶ 53, 56-66.) Further, Jacque's testimony is based on financial and commission records provided by NACE and DirecTV, as well as other relevant documents, agreements and depositions produced during discovery. (Pl.'s Ex. 2, Expert Report of Allen Jacque, at 1-2.) Thus, this Court concludes that Jacque's qualifications are based on specialized knowledge, experience and skill in the area of damages, that his methodology regarding the amount of unpaid commissions is reliable and that his testimony is helpful to the trier of fact. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (explaining that expert testimony must be relevant and reliable and must assist the trier of fact). Therefore, the Court denies defendant's motion to disqualify plaintiff's expert witness.

month period for which such Commissionable Programming Package was not paid by the applicable SO Subscriber.

(Pl.'s LR 56.1(a)(3) Stmt. ¶ 28.) Rouse testified that the Direct-to-Home activations for November 25, 2005 through December 31, 2009 are disclosed in the Dealer Weekly Detail Reports for Direct-to-Home Prepaid Commissions, which she downloaded from DirecTV's website. (*Id.* ¶ 30.) According to Jacque's analysis of these reports, NACE should have paid USA Satellite $5,441.17 in PPCs for Direct-to-Home programming packages during that four year period and $3,040.00 in Direct-to-Home prepaid commission to USA Satellite on various other occasions. (*Id.* ¶¶ 32-33.)

### C.    PPCs for Digital Bulk Programming Packages

Payment of PPCs for Digital Bulk programming packages is described in the MDU Agreement as follows:

> [NACE] shall pay [USA Satellite] a one-time payment of thirty-five dollars ($35) in the form of a pre-paid commission ("PPC") for each new net Tenant Subscriber activation under the MDU Bulk program. A new net Tenant Subscriber activation shall mean the aggregate number of Tenant Subscriber activations during the month less the highest total number of Tenant Subscribers, in the aggregate, at all the qualified SO Properties for any prior month . . . . In the event an order on which such a PPC is paid is terminated, canceled or disconnected (whether initiated by the Bulk SO Property or DirecTV) in fewer than 36 months or the Bulk SO Property fails to pay DirecTV for the entire period of a Commissionable Programming Package, [NACE] shall have the right to charge [USA Satellite] (or deduct from any Commissions otherwise payable to [USA Satellite]) a portion of such PPC, prorated to reflect the portion of the [36] month period for which such Commissionable Programming Package was not paid by the applicable Bulk S[O] Property.

(*Id.* ¶ 34.) Rouse testified that the number of Digital Bulk activations for November 25, 2005 through December 31, 2009 are disclosed in the MDU Digital Bulk PPC Reports, which were emailed to her from DirecTV. (*Id.* ¶ 35.) NACE was obligated, per the MDU Agreement, to

pay a PPC of $35.00 for each activation of a Digital Bulk programming package. (*Id.* ¶ 36.)

Jacque testified that NACE should have paid USA Satellite $22,447.00 in PPCs for Digital Bulk

programming packages. (*Id.* ¶ 38.)

Since January 15, 2005, NACE has paid $71,735.74 in commission payments to USA

Satellite. (*Id.* ¶ 48.) NACE, however, has not paid any commissions to USA Satellite since

February 2, 2009. (*Id.*) NACE also has not provided USA Satellite with any commission reports

showing the commission payable to USA Satellite since October 2008. (*Id.*)

### D.   SMATV Commissions

In 2005, USA Satellite states that it began entering Satellite Master Antenna Television

Agreements ("SMATV Agreements") with DirecTV. (*Id.* ¶ 39.) The record, however, shows that

such SMATV Agreements were actually between DirecTV and the property manger/owner of the

particular MDU customer. (Ex. 2, SMATV Agreement, at 5.) Further, the record is devoid of

evidence as to: (1) the difference between the SMATV and MDU Agreements; (2) why USA

Satellite believes it is a party to an SMATV Agreement with DirecTV or NACE; (3) why USA

Satellite changed agreements when its properties were already covered (and it was already

receiving commissions) under the MDU Agreement; and (4) why USA Satellite did not enter a

written contract with NACE, similar to the MDU Agreement, to ensure USA Satellite received

commissions for its services.

From what the Court can glean from plaintiff's statement of facts, although ultimately

unsupported, USA Satellite claims that NACE agreed to provide USA Satellite with commission

payments if USA Satellite chose NACE as its Master System Operator for the buildings that USA

Satellite had an exclusive right-of-entry agreement with (because such agreements gave USA

Satellite the exclusive right to pick the Master System Operator). (Pl.'s Mem. Supp. Summ. J.

14.) As previously mentioned, because neither party provides this Court with any information regarding why the parties entered these new types of agreements, the Court presumes that USA Satellite thought NACE would hold true to its alleged promise, and signed ninety-seven SMATV Agreements on behalf of its properties with DirecTV. (*Id.*) Unlike the MDU Agreement, however, which was between USA Satellite and NACE, the SMATV Agreement is between the property owner (signed by USA Satellite on behalf thereof), and DirecTV (signed by NACE on behalf of DirecTV). (*Id.*) NACE processes the SMATV Agreement and activates the SMATV account, and DirecTV pays NACE a monthly commission of five to fifteen percent of the money that DirecTV receives from the SMATV Agreement. (*Id.* ¶ 40.) NACE has received SMATV commissions from DirecTV of $234,783.71. (*Id.* ¶ 44.)

NACE's competitors, like Skynet, routinely share the SMATV commissions from DirecTV with System Operators, like USA satellite. (*Id.* ¶ 47.) Beginning in 2007, USA Satellite and Skynet entered into an agreement to share the DirecTV SMATV commission payments. (*Id.*) Thereafter, USA Satellite requested that NACE transfer its SMATV properties to Skynet, but NACE did not transfer the properties. (*Id.*) NACE's MDU contract with DirecTV describes how NACE may transfer property covered under the MDU Agreement:

> **Previous Operator Properties.** If [NACE] wishes to remove an Operator Property from the list of actively registered Operator Properties, [NACE] shall submit a written request to DirecTV for its review and approval. If DirecTV approves such removal . . . [NACE] shall assist . . . DirecTV with the transition of the service of Operator Subscribers to DirecTV or its designated system operator.

(*Id.* ¶ 54.) But there is no evidence in the record that such provision applies to property covered under the SMATV Agreement, which as far as the Court knows does not contain such a clause. Aaron Star, the President and CEO of NACE, testified that NACE cannot transfer plaintiff's properties, and that it will not ask DirecTV to transfer the properties because "[it] would be

8

unbusinesslike [sic] of [NACE] to take something that we are earning revenue from and just give it away." (*Id.*)

## Discussion

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant meets this burden, the non-movant cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). To succeed on a summary judgment motion, the evidence must be such "that [no] reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering the motion, the court must view all evidence in the light most favorable to the non-movant. *Id.* at 255.

I.      **Breach of Contract**

Plaintiff argues that defendant did not pay plaintiff commissions as required under two different agreements. To establish a breach of contract claim under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

### A.    MDU Agreement

Here, it is undisputed that the MDU Agreement entered into between plaintiff and defendant is a valid and enforceable contract.  (Pl.'s LR 56.1(a)(3) Stmt. ¶ 7.)  It is also undisputed that under the terms of the MDU Agreement, defendant promised to pay commissions and other payments to plaintiff and defendant has failed to do so.  (*Id.* ¶¶ 9, 48.)  Further, it is undisputed that plaintiff has performed all of its obligations under the Agreement.  (*Id.* ¶¶ 19, 52.)  Therefore, as a matter of law, plaintiff has established that defendant breached the MDU Agreement and, therefore, is entitled to the following damages, including payments and fees through December 31, 2009:

| Type of Commission | Amount |
| --- | --- |
| Direct-to-Home Prepaid Programming Commissions | $5,441.17 |
| Additional Direct-to-Home Prepaid Programming Commissions | $3,040.00 |
| Digital Bulk Prepaid Programming Commissions | $22,447.00 |
| Direct-to-Home and Digital Bulk Residual Commissions | $143,170.77 |
| NACE Payments to USA Satellite | ($71,735.74) |
| Total Payments Due to USA Satellite | $102,363.20 |

(*Id.* ¶¶ 27, 32-33, 38, 48.)[2]  In sum, the Court grants plaintiff's motion for summary judgment as to the MDU Agreement and awards plaintiff $102,363.20.

---

[2] Plaintiff also included $1,857.00 in damages for "other payments including rebates." (Pl.'s LR 56.1(a)(3) Stmt. ¶ 51.) This amount was unsubstantiated by the record and, therefore, not established by plaintiff. LR 56.1(a)(3).

## II.     SMATV Oral Agreement Between Plaintiff & Defendant

As previously mentioned, neither party to this litigation has explained to the Court the

purpose of the SMATV Agreements, why they differ from the MDU Agreement, and why USA

Satellite decided to sign (on behalf of its properties) ninety-seven such agreements. Plaintiff, as

with other critical facts necessary to support this claim, has not established either through its

statement of facts or elsewhere in the record that it had an oral or written agreement with NACE

regarding SMATV commissions or its SMATV properties. Plaintiff contends that the testimony

of its damages expert, who testified that "according to USA Satellite, [it] activated those

properties based on NACE's offer to share the commissions equally[,]" cures this defect.

(Jacque Decl. ¶ 35.)  However, while plaintiff's expert may be qualified to testify on the issue of

contract damages, he is not qualified to give an opinion on the existence or effect of any

agreement between the parties and, as such, his testimony as to what USA Satellite told him in

that regard is inadmissible hearsay. The Court cannot consider inadmissible evidence for

purposes of summary judgment pursuant to Local Rule 56.1, even where, as here, the opposing

party did not deny the proposition or object to the expert's hearsay statement.  *See, e.g., Judson*

*Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008)

(explaining that in deciding a motion for summary judgment, the court can only consider

evidence that would be admissible at trial); *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.,*

301 F.3d 610, 613 (7th Cir. 2002) (same); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.

1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is

inadmissible at trial.").  In accordance with Local Rule 56.1, which this Court strictly adheres to,

litigants must support facts, even if unopposed, with specific references to the record and with

evidence admissible at trial in order for such facts to be deemed admitted. *See LaFlamboy v.*

11

*Landek*, 587 F. Supp. 2d 914, 920-21 (N.D. Ill. 2008) (explaining that under LR 56.1, even if the movant's propositions are unopposed by the non-movant, they must be supported by admissible evidence to be considered by the court in a motion for summary judgment). Therefore, because plaintiff's only support for the existence of an oral agreement is inadmissible hearsay, such proposition is insufficient to create a genuine issue of material fact.

Alternatively, plaintiff argues that defendant is a third-party beneficiary of the SMATV Agreements between DirecTV and the property owners/mangers of the MDUs, and therefore has no right to stop the transfer of its properties thereunder. The third-party beneficiary doctrine generally establishes a third-party's rights or obligations to enforce a contract. *See Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 758 (7th Cir. 2008). It is rarely used as a basis for an agent to argue that *it* has standing, *i.e.* rights, to enforce a contract that it is not a party to, and that the third-party beneficiary does not. *Id.*; *see also* Restatement (Third) of Agency § 6.01 (stating that when an agent makes a contract on behalf of a disclosed principal, the principal and third party are parties to the contract, but the agent is not unless the agent and third party agree otherwise). Even assuming third party beneficiary theory can be used in this way, it would fail here because there is no property transfer provision in the SMATV Agreement. The MDU Agreement contains such a provision, but it does not apply to properties that have signed an SMATV Agreement with DirecTV. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 54.) Therefore, because the SMATV Agreement does not even address property transfers, this argument is moot.

Last, plaintiff argues that it is entitled to recover from defendant under the theory of unjust enrichment. To recovery under this theory, plaintiff must establish that: (1) defendant has unjustly retained a benefit to plaintiff's detriment and (2) defendant's retention of that benefit violates fundamental principles of justice, equity and good conscience. *HPI Health Care v.*

12

*Mount Vernon Hosp.*, 545 N.E.2d 672, 679 (Ill. 1989). The premise of the doctrine is that "[a]

person who has been unjustly enriched at the expense of another is required to make restitution to

the other." *F.H. Prince & Co., Inc. v. Towers Fin. Corp*, 656 N.E.2d 142, 151 (Ill. App. Ct. 1995)

(quoting Restatement of Restitution § 1, at 12).

Here, plaintiff has created a genuine issue of material fact that defendant was unjustly

enriched at its expense. Plaintiff's unjust enrichment claim seeks recovery of money that plaintiff

indirectly conferred on NACE by providing NACE with customers (allegedly in return for

commission payments). It is undisputed that NACE's SMATV contract with DirecTV provides

that it receives a commission payment for each SMATV customer it solicits. (Pl.'s Ex. 18,

DirecTV & NACE's SMATV Agreement, at 10-11.) As such, when plaintiff selected NACE as

its Master System Operator for its properties, NACE received a revenue stream of commissions.

(*Id.*) As of now, plaintiff is not receiving any commissions for providing these customers to

NACE. As previously stated, there remains a genuine issue of material fact as to whether plaintiff

is entitled to such commissions for providing NACE with customers. Because the record is

incomplete and ambiguous regarding the facts and circumstances in which the SMATV

Agreements were effectuated and why they were effectuated, there remain unresolved material

issues of fact as to plaintiff's claim for unjust enrichment.

## III.    Transferring Property—Injunctive Relief

Last, plaintiff asks the Court to transfer its property under contract with NACE to a third

party vendor of its choice. Because plaintiff is not a party to the SMATV agreement between

DirecTV and the MDU properties, it cannot sue for injunctive relief thereunder. *Haake v. Bd. of*

*Educ. for Tp. High Sch. Glenbard Dist. 87*, 925 N.E.2d 297, 306 (Ill. App. Ct. 2010) (generally,

only a party to the contract, one in privity with a party, or a third-party beneficiary of the contract

has standing to sue on the contract). Therefore, plaintiff's claim for injunctive relief can only

apply to the properties covered under plaintiff's MDU Agreement with NACE.

Under Illinois law, injunctive relief is appropriate where the moving party can

demonstrate: (1) a clearly ascertained right in need of protection; (2) irreparable injury in the

absence of an injunction; (3) no adequate remedy at law; and (4) a reasonable likelihood of

success on the merits. *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999) (citing

*Office Mates 5, N. Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1079 (Ill. App. Ct. 1992)).

Here, plaintiff has failed to establish that it has no adequate remedy at law such that it will

suffer irreparable harm. To establish irreparable harm plaintiff must show that it has no adequate

remedy at law, meaning "monetary damages cannot adequately compensate the injury and the

injury cannot be measured by pecuniary standards." *See, e.g., Fisher v. Brombolich*, 566 N.E.2d

785, 793 (Ill. App. Ct. 1991); *Shodeen v. Chi. Title & Trust Co.*, 515 N.E.2d 1339, 1345 (Ill. App.

Ct. 1987) (explaining that whether plaintiff succeeds on the merits or not, a preliminary injunction

should not be granted where plaintiff's damages could be compensated adequately by monetary

damages). Generally, in a breach of contract action, irreparable harm is established when the

injury is to the reputation or goodwill of the business or when defendant is insolvent, neither of

which plaintiff has established here. *See Bd. of Educ. v. Miller*, 812 N.E.2d 688, 695 (Ill. App. Ct.

2004); *Allstate Amusement Co. v. Pasinato*, 421 N.E.2d 374, 376-77 (Ill. App. Ct. 1981). Here,

because plaintiff's claims are capable of being measured and corrected by an award of money

damages, plaintiff has an adequate remedy at law. *See Ajex Eng'g Corp. v. Sentry Ins.*, 491

N.E.2d 947, 950 (Ill. App. Ct. 1986) (explaining that the existence of an adequate remedy at law

14

(regardless of plaintiff's success on the merits) precludes the court from granting equitable relief).

Therefore, the Court finds as a matter of law that plaintiff is not entitled to injunctive relief.

### Conclusion

As stated in the Court's Memorandum Opinion and Order, it denies defendant's motion to disqualify plaintiff's expert with regard to damages [doc. no. 72] and grants in part and denies in part plaintiff's summary judgment motion [doc. no. 77]. The Court grants the motion as to plaintiff's breach of contract and accounting claims for the MDU Agreement and finds that plaintiff's damages as of December 31, 2009 are $102,363.20. To determine the amount of unpaid commissions, fees and other payments from January 1, 2010 through May 31, 2011, the Court orders: (1) defendant to provide plaintiff with an accounting from January 1, 2010 through May 31, 2011; and (2) the parties to submit by May 31, 2011 an agreed calculation of commissions, fees and other payments due to plaintiff from January 1, 2010 through May 31, 2011. If the parties cannot come to an agreed calculation, each side has until May 31, 2011 to submit its proposed calculation with supportive documentation. The Court also finds as a matter of law that plaintiff is not entitled to injunctive relief. In all other respects, the Court denies plaintiff's summary judgment motion. Therefore, the sole issue for trial is whether plaintiff is entitled to SMATV commission payments from NACE either pursuant to an oral agreement or under a theory of unjust enrichment. The parties shall be prepared to set a date for the filing of the final pretrial order and a trial date at the status hearing on May 18, 2011 at 9:30 a.m.

**SO ORDERED**                    ENTER:   5/2/11

RONALD A. GUZMAN
**District Judge**