**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **USA SATELLITE & CABLE, INC.,** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) ) | **No. 09 C 2067** |
| **v.** | ) ) ) | |
| **NORTH AMERICAN CABLE EQUIPMENT, INC.,** | ) ) ) ) ) | **Judge Ronald A. Guzmán** |
| **Defendant.** | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the final chapter in an ongoing contract dispute between plaintiff and defendant. The ultimate issue in this trial is whether plaintiff, USA Satellite & Cable, Inc. ("USA Satellite"), is entitled to compensation from North American Cable Equipment, Inc. ("NACE") under either of two theories, unjust enrichment or oral agreement, for ninety-five properties under Satellite Master Antenna Television ("SMATV") agreements.[1] NACE is considered a dealer of record or affiliate of the program provider DirecTV. USA Satellite is considered a contractor, subcontractor or dealer. The product that both plaintiff and defendant

---

[1] The SMATV contracts for the ninety-five properties at issue are listed in Joint Trial Exhibit 63.

sell is DirecTV's programming. The two types of programming packages provided by DirecTV that are involved in this case are MDU and SMATV programming. The properties are the end users of and subscribers to the programming that is received from DirecTV. Typical properties are nursing homes, hospitals and apartment buildings. (Tr. 18.) Properties have agreements with DirecTV to receive and watch the satellite programming in exchange for a monthly fee. DirecTV, however, does not directly install or maintain the necessary satellite equipment at these properties. DirecTV typically contracts with dealers of record, such as NACE, to accomplish this task. (*Id.*) The dealer of record may, in turn, hire a contractor or subcontractor to do all or part of the actual work in installing and/or maintaining the equipment. In this case, NACE, which is based in Pennsylvania, relies in part upon contractors such as USA Satellite to find and register the properties, install the equipment for the satellite programming at those properties, perform maintenance and respond to service calls for equipment malfunctions. NACE receives a commission from DirecTV for originating and servicing properties which subscribe to DirecTV's SMATV and/or MDU programming. (Tr. 19.)

The actual servicing of the equipment is not performed by NACE. NACE, in fact, has no permanent physical presence in Illinois. For the most part, it relies upon dealers or subcontractors like USA Satellite to install much of the equipment and to maintain and otherwise service the equipment that delivers DirecTV's programming to the property. The basic issue in this case is whether NACE properly compensated USA Satellite for its work in obtaining clients and installing and servicing equipment for some ninety-five SMATV properties. USA Satellite maintains it was entitled to and never received a commission for SMATV

properties it obtained for NACE, a discount on equipment installed and maintained and a fee for maintaining the equipment. NACE, on the other hand, denies that USA Satellite is entitled to any commission, or that NACE failed to provide the promised discounts or that it failed to compensate USA Satellite for its maintenance work.


Originally, USA Satellite was doing business through a different dealer of record or affiliate - Pace. Because Pace was having financial difficulties meeting its financial obligations, USA Satellite decided to take its business elsewhere and transferred its MDU accounts to NACE. Then, in 2004 or 2005, USA Satellite started converting properties from MDU to the SMATV subscriptions because it was much cheaper for the client. (Tr. 24.) This process required that the client/property sign a new agreement for SMATV programming with DirecTV and that USA Satellite terminate the receivers which were used under the MDU agreement and install new receivers. DIRECTV would have to turn off the MDU programming for these buildings and reinstate service under a new SMATV subscription agreement. (Tr. 26.) Under an SMATV agreement, DirecTV charges the property a much lower rate because it is selling a set package of programs to the entire building. Generally, under SMATV agreements, one dish services the whole building and each unit within the building gets only the channels/programs the package calls for, although in a hybrid system it is also possible for a unit to get its own receiver and get more channels than the package allows. The building, in turn, sends out the same package of DirecTV programs to every unit in the building. (Tr. 35.) For MDU subscriptions, the commissions DirecTV pays to NACE are shared with USA Satellite. SMATV commissions are much lower. In MDU agreements, NACE is considered a dealer of record. In the SMATV

agreements, NACE is what is called an affiliate of DirecTV. According to Shai Harmelech, Vice President of USA Satellite, the introduction of SMATV programming requires the installation of a "head end." Head ends can cost from $5,000.00-$30,000.00 to design and build.

Harmelech testified that he operates USA Satellite from his home with his wife and a part-time assistant who help keep the books and records. The company uses three to fifteen subcontractors, *i.e.*, technicians. In general, Harmelech alleges that when USA Satellite acts as a subcontractor for a dealer under the SMATV agreement, USA Satellite is supposed to get a commission, equipment and a finder's fee. (Tr. 23.)

Harmelech testified that under many SMATV agreements USA Satellite does all required maintenance to the equipment after it is installed. Such service calls can come to USA Satellite in different ways. The client may call NACE which may send an e-mail or make a phone call to USA Satellite. Clients also sometimes call DirecTV which, in turn, sends them to NACE. Harmelech gave several specific examples of maintenance jobs USA Satellite would do for which NACE never reimbursed or paid it. On the whole, however, his testimony in this, as in other respects, was confusing and inconsistent. Harmelech insists that he was supposed to be paid a percentage of NACE's commission for servicing the SMATV clients. Asked if he received commissions in order to service the properties he responded: "That's the whole idea." But, he also testified that subcontractors in the industry are generally paid $79.00 to go to a location and approximately $125.00 for the first hour and $75.00 for any time thereafter to fix

the problem. This would imply piece-rate compensation and not a fixed commission arrangement. In addition, on cross-examination, plaintiff admitted that it was part of his business model to enter into service agreements with the properties he signs up and that the fees he charges the properties for the use or service agreements is, at least in part, how he makes his money. As plaintiff explains it, because servicing the accounts is a part of NACE's responsibility under the commission agreement between NACE and DirecTV, NACE must find someone to actually do the service work because NACE does not have a presence in Illinois. NACE often will turn to the initial installer of the equipment when contacted by a property or by DirecTV to respond to the service call. As a practical matter, one wonders why, if plaintiff already has a separate service agreement with the client/property, why the client would be calling DirecTV or NACE for service in the first place? In addition, according to Harmelech, it appears there are three possible sources of payment for USA Satellite on any given service call: the percent commission he insists he is entitled to under an oral contract, a combination flat fee and hourly fee (the customary payment for contractors on service calls to which he testified) and the fee from the property under his service agreement with the property. When asked if USA Satellite was sometimes paid both a commission and a flat fee for servicing properties, he responded that it depends on the situation, but he never explained under what circumstances or for what specific properties he would be paid a commission, a flat fee, an hourly rate or a combination thereof. (Tr. 17, 22.) Asked if he sometimes gets paid both by the client and NACE, he responded that he does. How all of this works is a mystery.

Harmelech also complained that NACE promised to give USA Satellite "free receivers or free other equipment, like dishes and other equipment" which he needed to install in order to bring DirecTV's programming to the building, but instead ended up charging him for the equipment. (Tr. 19.) Harmelech, however, never accurately or concisely itemized the equipment for the ninety-five properties at issue for which he was improperly charged or the ultimate cost to him of NACE's failure to keep its promise to provide the equipment free of charge.

In 2005, USA Satellite was working not only with NACE, but also with DirecTV authorized dealers Skynet, Pace and Perfect 10. In that year, because he was receiving no payments from Pace, he asked DirecTV to transfer all of his MDU properties to NACE. He claims one of their salesman named Ozer told him that they would like to get MDU contracts. (Tr. 24.) So DirecTV made Pace sign an agreement to transfer the properties.

Harmelech testified that Joint Trial Exhibit 63 contains the SMATV contracts for the ninety-five SMATV properties that are at issue in this lawsuit. The Lodging and Institutions SMATV Viewing Agreement found in Tab 4628666 of that exhibit is identified as an example of a typical SMATV agreement between DirecTV and a customer. This particular customer is located at 2121 Ridge in Evanston Illinois. It appears that the agreement is signed by Shai Harmelech as authorized agent for the customer, *i.e.*, property. There appears to be some confusion however as Harmelech designates himself "President" of the customer rather than as merely an agent on a line labeled "name of authorized officer/agent & title." Indeed, on cross-examination, Harmelech appears to assert that he is a

party to the agreement between the customer and DirecTV because of his signature on the SMATV Viewing Agreement. The agreement and attached information sheets were all filled out by Harmelech and contain detailed information about the customer, the number of units, the DirecTV account number, the equipment and the programming which will be delivered. NACE is designated as the "direct affiliate."

In late 2005, Harmelech decided to deactivate some properties which were under the MDU program and reactivate them under the SMATV program in order to save clients money. He caused USA Satellite to switch from twenty to thirty buildings from the MDU to SMATV program. He described the property of Park Evanston, a 280-unit building, as an example of such a change. According to Harmelech, Park Evanston paid $6,751.00 to DirecTV for programming under the MDU agreement. Of this amount, NACE received $1,211.00 from DirecTV and NACE gave USA Satellite 15% or 17% of that. When switched to the SMATV program, the same client paid only $2,512.00 to DirecTV for the programming. NACE received a commission of $215.00. The interesting part is that Harmelech acknowledged that under the SMATV program, USA Satellite got no commission whatsoever.

> Q. So when you dropped or changed from MDU to the SMATV, you basically gave up $1,020?
>
> A. Correct.
>
> Q. Why did you choose to do that?

A.  So I wouldn't have too much expenses because the $1,000 didn't cover all this back and forth.

Q.  Did it also help the buildings?

A.  Oh, tremendous.  As you can see, it's like a $4,000 difference.

(Tr. 34.)  In his response, Harmelech appears to acknowledge that under the SMATV agreement, he was not entitled to any portion of NACE's much reduced commission.  He expressly states that he *chose* to give up the commission and even explains why  - apparently the amount of the commission he was receiving under the MDU agreement was insufficient for all of the work he was doing to maintain the equipment in the building.  He claims, however, that NACE orally agreed to pay him a finder's fee, a percentage, free equipment and to build the head ends for him for the properties he was converting.  (Tr. 37.)

Well like in the beginning like I said when I moved the MDU over there and I started actually in 2004 building - building equipment for SMATV, they made agreement and said we'll give you a percentage and equipment for free and we'll put the head ends together for you So if I'm not mistaken I did about 10 to 15 properties in '04

(Tr. 37-38.)  What is unclear here is the timing.  It is unclear whether plaintiff is talking about his agreement when he began to move the MDU properties over from Pace to NACE or an agreement relating to switching from MDU to SMATV.

Although plaintiff refers to 2004, his attorney seems to assume that plaintiff is referring to conversations in 2005 because he then asks:

> You're jumping ahead.  All I want to know is talk
> about in late 2005… That's when you started to
> switch some of the --

(Tr. 38.)  Harmelech is also inconsistent regarding the terms of the alleged oral agreement.  A good example is the following exchange:

> Q.   So today your testimony is you thought you were
> going to get 15 percent plus incentives –
>
> A.  Yes.
>
> Q.   -- for equipment and that was going to equal 50
> percent of the commissions?  Is that what you're trying to
> tell the Court today?
>
> A.   *I guess.*
>
> Q.   So you have no idea what your agreement was in it
> 2004?
>
> A.   The agreement was that they going to give me --
> again, I'll say it again slowly. They going to put together
> a head end for me, and 3 or 4, or $5,000.00, they going to
> give me X amount for the incentives, in other words, for
> the -- from the residual, and then deduct it from the labor.
> I mean, it's too bad I don't have invoices here to show it,
> actually, but it was.
>
> Q.   Okay.  So that's the conversation you had with Mr.
> Ozer in 2004?
>
> A.   Yes.

   Q.  So now we're saying that they were going to give you some kind of credit against labor, but you weren't supposed to get the 50 percent – you're confusing me, Mr. Harmelech.

   A.  *Well, I guess I was confused myself in the beginning* by saying how much – that's why it was the whole idea about sending e-mails continuously to North American Cable --

(Tr. 114-15.)  As can be seen, plaintiff's testimony regarding his alleged oral contract is vague and confusing.  At yet another point in the testimony, plaintiff asserts that the agreement with Ozer if a program was $2,000.00 a month he would get 15% of that, which would be deducted from the cost of the labor he was paying to NACE for the construction of the head end equipment.  He also explained that he assumed he would be getting 15% because that's what the MDU agreement was:  "they usually - on MDU they (NACE) get a 28%, and they will give me like the MDU…."  (Tr. 116-18.)  But plaintiff previously insisted that his oral agreement with NACE was entered into in 2004, and at that time plaintiff had no MDU agreement with NACE upon which to base such an assumption.  His MDU agreement with NACE was entered into in 2005.  (Jt. Trial Ex. 1.)  Plaintiff's answers leave the impression that his testimony regarding his alleged oral agreement is based on the expectations he has come to have from his MDU contract with NACE and subsequnet SMATV contracts with other DirecTV affiliates such as Skynet, rather than on any conversation or agreement originally reached with NACE.

Plaintiff also claims that from 2004 until he filed suit in 2009, he never received any SMATV account commissions, yet he continued to open accounts for NACE through 2008. If true, that would mean plaintiff was being denied a major part of the agreed-upon compensation for the accounts he was opening for NACE for four years and yet he continued to turn those accounts to NACE when he clearly had other affiliates he could turn to. Such conduct does not seem likely; especially not for someone as experienced and knowledgeable in the industry practices and customs. Indeed, shortly after commencing to establish SMATV accounts for NACE, plaintiff concluded that he could save money by building his own head end equipment rather than having NACE install it for him and discontinued NACE's service in that regard. He was clearly keeping track of both his income and his expenses at this point and making decisions as to how to increase his net profit from his SMATV arrangements with NACE. (Tr. 37-38.) Furthermore, plaintiff proffers no direct explanation as to how the parties accommodated this material change in their alleged oral agreement if, as he contends, the agreement called for his "residuals" to be credited against the labor cost he would owe NACE for its work in "putting together" the head end. Such a change would appear to have reduced NACE's profit in the transactions with no accommodation whatsoever.

Plaintiff concedes that the only agreement he had with NACE for SMATV properties was oral. But, other than saying it was sometime in 2004, he cannot recall the date upon which this agreement with Mr. Ozer was reached. (Tr. 111.) He also states that his agreement was reached in conversations with both Ozer and Aaron. He never had a written agreement with NACE regarding the SMATV properties. He did enter into a written agreement with NACE regarding MDU

accounts on January 14, 2005.  (Joint Ex. 1.)  On cross-examination, he agrees that his detailed forty-five-page written agreement with NACE for MDU accounts was entered into after he claims he entered into an oral agreement with NACE regarding the SMATV accounts.  But he provided no explanation why the later written MDU agreement did not include the understanding regarding the SMATV accounts as well. (Tr. 144.)  In fact, when asked why he failed to include the terms of the SMATV accounts in his written contract with NACE, plaintiff responded by denying that he ever even read the MDU contract he signed with NACE.  (Tr. 109.) In this regard, he was substantially impeached by his deposition testimony in which he testified that he did review the contract and had an attorney review it as well.  He attempted to explain this contradiction by pointing out that it was his attorney who read the contract and by further elaborating, "[S]o I don't understand the mumbo-jumbo."  (Tr. 109-11.)

Plaintiff also claims that although NACE purported to credit the amounts owed him on commissions for the SMATV properties against the cost of the head ends equipment that plaintiff purchased from NACE, when he asked for documentation reflecting how much he was being charged for the equipment and how much he was being credited for the unpaid commissions, NACE never responded.  He asked for this supporting documentation many, many times. Subsequently, plaintiff complains, he found out he was being overcharged for the head end equipment.

Plaintiff also complains that NACE charged him for equipment that was supposed to be free according to their agreement.  NACE, plaintiff contends, lied to him and told him that NACE had to pay for this equipment.  Later, apparently,

plaintiff found out from Skynet that it obtained receivers for free from DIRECTV and would pass these on to its contractors for free. (Tr. 49-50.) When he confronted NACE with this information in 2007, NACE admitted this and agreed to provide the receivers at no cost from then on. But this sequence of events makes no sense whatsoever if, as plaintiff alleges, his original agreement with NACE, way back in 2004, called for him to get the equipment for free. If plaintiff discovered that NACE with charging him up to $70.00 for a receiver that the alleged oral agreement said he would be getting at no charge, why would he wait until he discovered from his dealings with Skynet that NACE was receiving the equipment for free before confronting NACE with the overcharge? Again, it appears that plaintiff, unhappy with the deal he had with NACE, is alleging an oral agreement that contains what he feels ought to have been the terms of his dealings with NACE.

Harmelech complains of charges against his credit card for equipment purchases that ought to have been discounted by credits but were not as well as unpaid residuals from MDU and SMATV programming. Plaintiff's complaints are not limited to the amount of SMATV commissions. He complains he was never paid on time, never paid for the SMATV properties, did not receive paperwork for the MDU properties and did not receive a prize of free tickets to Puerto Rico which he won as the person who sold the most SMATV programming. (Tr. 44.) He also complains that he was not paid for service work. Yet, according to plaintiff it was not until August or September of 2006, when he "started doing the books" with his accountant, that he determined that NACE stopped paying him altogether for their SMATV properties. NACE would foil his attempts to find out exactly what he was being paid by delaying payment for as much as 120 days, claiming they had not

received the proper paperwork from DIRECTV and/or that NACE employee Mary
Rouse did not know how to properly calculate his compensation. He claims he
received commission checks for SMATV accounts with no documentation as to
what properties or services the checks were for. When he called and asked for
explanatory documentation, NACE would promise the paperwork, but it would
never send it. Other companies he worked for (Skynet) actually allowed him to see
the commission residual statements from DirecTV. It took him two years to
discover all of this cheating because he contends he was so busy installing
programming in some fifty buildings during 2004 - 2006 that he had no time to
ascertain that he was being shortchanged. He complains that he had no idea what
certain checks were for, what he was supposed to get or what NACE actually paid
for. (Tr. 41-43.)


    According to plaintiff under his oral agreement with NACE, his
commissions, in addition to being used as setoffs for the cost of equipment he
purchased from NACE, also served as compensation for service calls he made to
SMATV properties. But that was not all; he was also to be paid extra for certain
types of service work. How either he or NACE knew how much extra and for what
types of service work, he does not explain. He merely states that is how it is
supposed to be. When pressed as to whether if, in reaching his oral agreement with
Starr and Ozer, he also negotiated specific terms regarding chargebacks, plaintiff
inexplicably responds, "I believe so. I believe I signed a contract in '04 and '05 for
receivers for chargebacks, yes." (Tr. 127-28.) Subsequently, he admitted that he
could not be sure if this written chargebacks agreement related to SMATV or
MDU properties. This is just another indication that plaintiff is getting his alleged
oral agreement for SMATV accounts confused with his written MDU agreement.

It appears that plaintiff is describing what he believes his SMATV agreement with NACE ought, in fairness, to have been and that he is using his subsequent arrangement with Skynet and his MDU agreement with NACE as a basis to determine what such a fair agreement would be. For example, his attorney asked him why it was wrong for NACE to charge him for the SMATV receivers that were used for the ninety-five properties. He gave three answers to this question. His immediate response: "because it was free from DirecTV." He follows up by adding "and they (NACE) promised they gonna give it to me for free." Finally, this third answer, "And Skynet gave me all the receivers for free, the same thing." (Tr. 95.) It is telling that his first response is that he should have gotten the equipment for free because NACE was getting the equipment for free. If NACE had actually expressly promised such a thing, one would expect that to have been the first thing out of the plaintiff's mouth. Why was it wrong for NACE to charge for the receivers? Because they promised they would not do it. Instead, he gives an answer that suggests not so much that NACE promised not to charge him for this equipment, but that it was unfair of them to charge him because they were getting the receivers for free. He finishes his answer with a second reason it was unfair for NACE to charge him for the equipment – Skynet was not charging him for the same equipment.

According to plaintiff, he initiated approximately ninety-five SMATV properties over a four-year period and was never paid one dime.[2] It took him three

---

[2] In fact, it is not so simple. Even in the ninety-five properties only some of the channels/accounts were receiving Direct TV programming, others were receiving programming from Dish Network.

to four years to decide that if he was not getting paid for bringing in new SMATV accounts, he was not going to continue to do so.  On cross-examination, however, plaintiff admits that it is part of his business model to enter into service agreements with the properties which he signs up and that the fees he charges for the use or service agreements is, at least in part, how he makes his money.  Plaintiff also makes money by selling the equipment he purchases from NACE to the properties for initial installation.  (Tr. 144-45.)  Plaintiff was clearly making money on these new SMATV subscriptions without receiving any commission from NACE.

Plaintiff was shown equipment invoices indicating he had received a sales promotion credit against the amount owed for certain equipment. However, plaintiff claimed that the credit was not a discount on the equipment price, but rather a credit for his residuals against the labor costs that he owed for NACE's labor in installing the head ends.  But according to plaintiff's testimony, this practice of deducting his residuals from the labor cost was something done only in the beginning of their agreement because he soon discovered he could build the head ends himself and make more money and stopped paying NACE for building the head ends.  However, some of the invoices showing this credit were for the year 2007 - well beyond the beginning of the alleged agreement which was, according to plaintiff, in 2004.  This was never explained.

Finally, in 2007, plaintiff claims he entered into an agreement with Skynet to take his business somewhere else. Thereafter, plaintiff registered approximately 150 to 200 properties with Skynet.  The agreement with Skynet was for 50% commissions (one half of the commission Skynet received from DirecTV) and for

free equipment (to receive free the equipment Skynet was getting free from DirecTV). The agreement with Skynet was oral for the first six months and then reduced to writing. Eventually, by letter (Joint Trial Ex. 41), in December 2008, plaintiff demanded that NACE transfer its SMATV accounts to Skynet. Aaron Starr lied to him when he (Starr) said that plaintiff could go directly to DirecTV in order to transfer the accounts to Skynet.[3] According to plaintiff, he discovered he needed permission from NACE in order for DirecTV to make the transfer.

In September or October of last year, plaintiff claims he called DirecTV and asked them to inspect (audit) about 300 of his properties. Apparently, this audit was somehow related to a lawsuit the defendant lost regarding certain Russian programming the defendant had provided to some of the 300 properties. According to plaintiff, after this lawsuit he met with DirecTV and DirecTV agreed to transfer the properties.

Plaintiff's expert, Allen Jacque, testified that based upon NACE's stipulation, the total commissions received from DirecTV for the ninety-five SMATV properties listed in Joint Trial Exhibit 9 from January 2005 through March 2011 is $197,871.92. Jacque calculated the total interest on this amount (for purposes of prejudgment interest in the event of a judgment of disgorgement) at 6% per annum to be $33,768.02.

---

[3] Apparently, plaintiff's relationship with Skynet did not last long because he is no longer a subcontractor with Skynet and is no longer receiving commissions on the properties he signed with Skynet.

Compared to plaintiff's testimony, NACE's witnesses, although not entirely consistent, were more convincing, both in the manner in which they testified and in the content of their testimony. NACE, presented three witnesses who directly contradicted Harmelech's testimony as to the core issues in this case. Elizabeth Ann DiMatteo has been manager of the DirecTV Department for NACE since May 2009. She oversees all aspects of the DirecTV business, including recruiting, signing, negotiating with system operators and managing contractors and subcontractors. The department she manages consists of her and three other workers. Her department also processes paperwork for programming and commission payments to the signed system operators and acts as the liaison between the properties and DirecTV. It would appear that DiMatteo has a significant stake in the profitability of the department she manages as the revenue generated from the SMATV agreement with DirecTV offsets the salaries of all of the workers in her department. She is familiar with NACE's SMATV program. She testified that prior to September 2009, DirecTV did not permit NACE to pay commissions on SMATV properties, and, although some requested it, NACE never paid commissions to any dealers before receiving permission to do so in 2009.[4] At the present time, NACE pays commissions to some 132-140 subcontractors for SMATV properties that have entered into a written agreement to perform certain duties at the properties in exchange for which NACE is able to pass commissions through to them. NACE dealt with some of these subcontractors prior to being allowed to pay commissions. Prior to being authorized to pay commissions, dealers would need to give the paperwork for the programming that the properties

---

[4] The witness' belief that NACE was not allowed to pay commissions prior to September 2009 comes from what she was told when she began her employment in May 2009 and from documents she was given to read when she was first employed; specifically the language in section 2.13 of the Direct TV SMATV Affiliate Agreement (Joint Trial Ex. 3) which prohibits the affiliate (NACE) from "us[ing] any person or entity other than its full-time employees in soliciting or taking orders for DirecTV programming without the prior written consent of DirecTV...."

signed up for to NACE (a DirecTV affiliate) in order to have the properties activated. NACE would then pass the paperwork on to DirecTV which would, in turn, activate the programming for that property. The dealers were not paid anything by NACE for activating the properties. They were given discounts on equipment, head end builds, shipping and hardware. The dealers could either pass these savings on to their customers or increase their profit when they sold the equipment to the customers. Prior to 2009 that was the only compensation dealers received from NACE. Subsequent to the change in September 2009, any dealers who do not have a signed agreement with NACE for the payment of commissions would still receive only the hardware related discounts and incentives. (Tr. 233-34.) Depending on the programming package, NACE receives commissions in the amount of 5% to 15% on SMATV agreements.


NACE's main duty under its agreement with DirecTV was to provide service to the properties. The properties may call DirecTV for service and DirecTV would refer the call to NACE, or the properties might call NACE directly. NACE would then dispatch companies to do the actual work. In that situation the cost of doing the work would be borne by the property, not by NACE. The witness also testified, however, that when NACE needs someone to service the properties it generally uses the subcontractor that registered the property with NACE. For the SMATV properties that it registered, USA Satellite would have been NACE's first choice to provide such service.[5] The witness estimates that NACE directed approximately half a dozen service calls to USA Satellite per week.

---

[5] Although the parties had stipulated that the ninety-five SMATV properties at issue in this case are USA Satellite properties, according to Aaron Starr, there appears to be a dispute even as to whether all of the ninety-five properties at issue were initially installed by USA Satellite and, therefore, whether USA Satellite would have been NACE's first choice to provide service to those properties. (Tr. 330.)

The witness testified that NACE has one written MDU contract with USA Satellite but no oral contracts. When hired, she was specifically instructed that their policy was not to enter into oral contracts. She does not know if NACE had oral agreements before the time that she was hired in May 2009.

Andrew Ozer ("Ozer") has been a salesperson for NACE since August 2000. As such, he has the responsibility for being an account manager for his accounts and selling them hardware equipment. Account equipment relates to cable and satellite TV equipment such as coaxial cable, equipment racks, power supplies, powers trips, combiners, multi-switches, connectors, RCA connectors, terminators, modulators and other things used in the distribution of satellite television including equipment necessary to build a head end.

Harmelech and Ozer substantially agree that USA Satellite's initial relationship with NACE was as a purchaser of equipment and that Harmelech purchased approximately $100,000.00-$200,000.00 worth of satellite equipment per year from NACE for installing satellite systems in properties.[6] Ozer recalled that he has been selling equipment to plaintiff since September 2002. When selling equipment to plaintiff, he often reduced the cost of the equipment, offered incentives such as free freight, and eliminated or reduced labor costs and material costs associated with building head ends. These incentives gave plaintiff a competitive advantage because it provided him with a reduction in costs which he

---

[6] Ozer estimated that since 2002, he has sold plaintiff's companies approximately $750,000.00 in equipment.

could pass on to his customers. In order to offer these incentives, Ozer required authorization from either Kirk Davis, his direct sales manager, or Aaron Starr, Chief Executive Officer and founder of NACE.

Ozer denies, however, ever having entered into any oral agreements on behalf of NACE with the plaintiff or any of his companies to provide SMATV programming. Ozer specifically denies that he ever entered into an oral agreement with plaintiff binding NACE to pay 15% or 50% of its commissions from SMATV programing. (Tr. 251.) In his interactions with plaintiff, he would frequently speak to plaintiff on the phone regarding equipment, equipment pricing and possibly advice regarding building a system. At times he would also relay messages from plaintiff to someone with authority or knowledge to answer his questions regarding MDU commissions. He was aware that approximately sometime in 2005, plaintiff entered into a written MDU agreement with NACE, but he has never promised plaintiff or done anything to lead plaintiff to believe that NACE would pay commissions for SMATV properties. (Tr. 262.)

On cross-examination, it was pointed out that in return for USA Satellite's registration of its SMATV properties, NACE assisted in manufacturing "head ends" for USA Satellite and on occasion waived labor costs for such assembly. On those occasions, USA Satellite paid for the hardware equipment, but not for the assembly costs, labor or associated materials. (Tr. 265-66.) Ozer explained that he did not consider this arrangement to be an oral agreement but, "at best, a sales-customer relationship understanding. But not an oral agreement with terms, exact guidelines, dates…." (Tr. 265.) Whether Ozer considers this to be an oral agreement, an oral contract or a sales-customer relationship, is not of particular

importance. According to Ozer, NACE would analyze the value of any SMATV contract brought to it by USA Satellite on a case-by-case basis and consider the value of the contract against the potential freight, labor, materials and possible reduction in the cost of the electronic equipment. Ozer's motive for making such arrangements was to sell plaintiff equipment. Thus, it appears there was what amounts to a separate oral agreement, or multiple, i.e., dozens of", oral agreements, crafted on a case-by-case basis, to construct head ends for and sell equipment to plaintiff at some discounted rate in exchange for each new SMATV property he brought to NACE. But Ozer's direct testimony denying that there was any agreement *for the payment of commissions* was unchallenged. Ozer's explanation of how NACE evaluated each proposed subscription separately and determined what kind of a deal it could profitably make on the sale of the equipment to Harmelech on a case-by-case basis makes sense and is supported by Starr's testimony.


Starr testified that there are two basic products sold by DirecTV, MDU subscriptions and SMATV subscriptions. According to Starr, in the case of MDU subscriptions, DirecTV charges more money for the same programming than it charges for an SMATV subscription. The advantage to a subscriber of an MDU subscription is that the client (property) is not required to pay up front the cost of purchasing and installing the equipment. In this arrangement, DirecTV gives the operator (NACE) prepaid commissions - money in advance so that NACE can install all the necessary equipment without charging the property. (Tr. 275-76.)

In the case of SMATV subscriptions, the property enters into a customized contract directly with DirectTv to purchase the signal for a monthly premium. NACE is merely a broker. DirecTV charges less, but because it does not have the same revenue levels it obtains from MDU subscriptions, DirecTV does not pay anything in advance to operators. According to Starr, for many years, DirecTV would not even offer the receivers at a reduced rate, would not offer equipment and did not pay anything up front to the affiliate in contrast to what it does in its MDU subscriptions. SMATV properties are required to make the capital investment necessary to install the initial equipment required to receive the programming. In addition, SMATV properties are required to pay whoever actually does the maintenance on the equipment after it is installed. MDU properties, on the other hand, do not pay for the cost of maintenance and servicing; the actual contractor is required to pay. After activation, the master system operator's sole obligation to DirecTV in an SMATV subscription is to make sure that customer requests for service are addressed. Sometimes NACE's own technical department, consisting of twelve or more individuals, can help the customer address the issue over the phone. Sometimes, the issue can be addressed by NACE's own technical department in conjunction with DirecTV; and sometimes a contractor (such as USA Satellite) has to be dispatched to the property. If the contractor fails to respond in a timely fashion, then NACE will send its own contractors to the site. If a contractor has to be dispatched to the site, in that case, the cost of addressing the problem is borne by the customer. (Tr. 278 -79, 291, 329.) But, NACE did not send any technicians of its own to any of the ninety-five properties at issue in this case.

The cost of servicing and maintaining the equipment is also higher for an MDU property because in an MDU property every unit may require its own receiver box, while at an SMATV property there is a single head end located in one place. The likelihood of failure at an MDU property is multiplied because each receiver box carries a potential for failure with consumer interaction versus an SMATV property where the potential for failure is in one head end and no consumer interaction.

Under its SMATV agreement with DirecTV, NACE was allowed to sign up properties for DirecTV programming, but it was barred from paying commissions. Starr's belief that NACE was initially barred from paying commissions to USA Satellite is based upon sections 2.1 and 2.13 of NACE's SMATV agreement with DirecTV (Joint Trial Ex. 3) and an e-mail conversation he initiated with Jeff Renner of Direct TV. In that conversation, he requested a clarification as to whether NACE could pay commissions under the agreement and was told that it could not. (Tr. 333-34, 339.) As a distributor, NACE could give dealers equipment discounts in exchange for new properties to sign up for DirecTV programming. The dealer benefited from being more competitive in the marketplace because the equipment discounts allowed him to hold a lower price than his competitors. Typically, the discount offered to the dealer (which the dealer could then pass on to the customer) would be in an amount that, under the terms of that contract, NACE could recapture in two to three years.[7] Based upon

---

[7] In this arrangement NACE incurred the full risk of recapturing its initial equipment discount. In order to allow for the possibility of being displaced by a competitor before the two- to three-year recapture period, NACE would include such factors in its discount analysis as the competence level of the contractor offering the new property, the level of difficulty and expense for a new contractor to come in and displace NACE before it could recapture its initial outlay as well as the potential revenue stream based upon the number of units. According to Starr, NACE has failed to recapture its initial equipment discount outlay on many of the ninety-five properties/subscriptions at issue in this lawsuit.

his personal involvement in negotiations in many markets around the country, Starr found that this model resulted in a competitive advantage to the dealers. NACE used this business model until 2009. In 2009, DirecTV began allowing NACE to pay commissions to dealers in order to give them even more leverage in the marketplace. Today, the company continues to use both models, *i.e.*, payment of commissions as well as the discounts on equipment in exchange for new business. Typically, if a dealer working on a potential commission-based deal cannot get the new client to sign, NACE will offer to switch the dealer to the equipment incentives model so they can offer a greater discount to the new client. This allows the dealer to at least get the benefit of selling the equipment at a discounted price and gaining a service contract and future relationship with the new client.


NACE began to do business with the plaintiff sometime in 2002. Initially, the nature of the business was equipment sales. Then, in 2004-05, DirecTV notified Starr that it would be transferring MDU properties to NACE in order for NACE to become the master system operator for those MDU properties. Properties for which plaintiff was the system operator were included. According to Starr, the transfer was being made because the current system operator had not been successful in getting the operator in the field to obtain more subscriptions in these properties. At that time, NACE's MDU agreement with DirecTV had a provision for transfers. The SMATV agreement does not have any provision which either allows or prohibits the transfer of subscriptions/properties. (Tr. 280, 335, 338.) Also in 2004-05, plaintiff approached NACE about submitting to it SMATV properties in exchange for discounts. NACE required USA Satellite to provide it with a description of the actual programming the property was willing to take and the number of units. From this information, NACE would calculate what

level of commissions NACE could expect and, therefore, what level of the discounts it could afford to give plaintiff (which plaintiff could then pass on to the customer). Typically, NACE would offer Harmelech a discount amount which it believed it could recapture in two to three years. Once it reached an agreement with USA Satellite on the amount of discount, NACE would ship the equipment and a discount would be noted "on there." (Tr. 281.) Starr confirmed what both Ozer and DiMatteo said: NACE never entered into an oral contract with USA Satellite to pay it commissions for SMATV subscriptions. (Tr. 284.) Such a contract would have violated NACE's written contract with DirecTV. Nor did USA Satellite ever ask for a written agreement regarding SMATV properties – not even after the changes instituted by DirecTV in 2009.

Starr directly contradicted Harmelech's contention that NACE never provided him documentation itemizing the amounts of discounts or other forms of payments or credits he was receiving. According to Starr, the opposite was true: "and we would send him ad nauseam levels of documentation by e-mail and mail; we would send it to his attorney. We would justify line item by line item down to the penny everything that we sent him, and over time he would continue to complain and complain ." (Tr. 286.) On cross-examination, however, it was pointed out that Ozer complained to him of the company's inability to relay detailed information in a timely manner to customers. (Tr. 305.) Starr responded by pointing out that in response to Harmelech's constant complaints, NACE did a full internal accounting with multiple levels of audit and sent the information to Harmelech's attorney, Michael Newman.

When asked about the existence of oral agreements in its SMATV dealings with USA Satellite, Starr responded:

> On an individual basis, property -- one property at a time, not predicated on any global items, we will do an analysis and determine an amount that we are willing to put forward as a discount on equipment and recapture over a period of time. We negotiate and then memorialize it in an invoice which turns it into a written document.

(Tr. 322.) As with Ozer, Starr's characterization of the transactions with USA Satellite as either oral agreements or memorialized oral agreements or written invoice documents is not what is important. What is of consequence is that Starr and Ozer's explanation of NACE's dealings with USA Satellite is much more believable and consistent than Harmelech's vague testimony of an oral contract for commissions – a contract which was violated from its very inception but which he continued to engage in for years. Ozer and Starr's explanation is more believable than Harmelech's contention that he was so busy it took him from 2004 to the end of 2006 to find out he was not being paid a penny of the commissions he was entitled to according to an oral contract.

As with any action for breach of an oral contract, the plaintiff bears the burden in this case to both plead and prove the essential terms of the agreement sued on; that is, the offer made and its acceptance. *Richco Plastic Co. v. IMS Co*. 681 N.E.2d 56, 59 (Ill. App. Ct. 1997); *Martin-Trigona v. Bloomington Fed. Sav. & Loan Ass'n*, 428 N.E.2d 1028, 1031 (Ill. App. Ct. 1981). Oral contracts are enforceable only if there is an offer, an acceptance, and a meeting of the minds regarding the terms. *Johnson v. Hermanson,* 582 N.E.2d 265, 267 (Ill. App. Ct.

1991).  For the reasons given above, the Court finds that the plaintiff has failed to establish the existence of an oral contract for the payment of commissions between the parties.  As discussed above, the main testimony in this regard came from Harmelech, and that testimony was vague, uncertain and often contradictory. Neither his testimony as to any actual conversations nor his testimony as to the course of conduct followed by the parties subsequent to the alleged oral agreement serves to establish that any such agreement actually existed.

What the evidence establishes is that plaintiff and defendant entered into agreements on a case-by-case basis regarding discounts for equipment and labor which offered plaintiff a competitive advantage and/or a means of making a greater profit in signing up each individual property.  The exact terms of these agreements were determined by NACE's profitability analysis and, were subject to change on a case-by-case basis by either side; as, for example, when plaintiff determined he no longer wished to pay NACE to build the head ends for him but would instead do it himself in order to maximize his own profits.

Plaintiff also claims a right to recover on the theory of unjust enrichment.  In that regard:

> Illinois courts have implied a contract in law based upon the defendant's receipt of a benefit which would be unjust for him to retain without paying for it.  All of these cases stand for the general proposition that a person shall not enrich himself at another's expense . . . .

*Partipilo v. Hallman*, 510 N.E.2d 8, 10 (Ill. App. Ct. 1987) (citations omitted). Thus, in order to succeed on his claim of unjust enrichment, plaintiff would have to

prove that the defendant unjustly retained a benefit for which it has not paid.
Again, for the reasons given above, the Court finds the plaintiff has failed to
establish defendant's liability on the theory of unjust enrichment. The credible
evidence establishes that plaintiff engaged in numerous transactions with the
defendant. The specific terms of each of those transactions was structured
differently based upon the analysis performed by the defendant as to the likely
income flow from the proposed subscription and, therefore, the amount of the
discounted equipment and services it could offer to plaintiff. Plaintiff could then
sell the equipment at a profit to the subscriber. There is nothing inherently unfair
or unjust about such a commercial relationship. Plaintiff was given an opportunity
to obtain a profit on the sale of the equipment and on its services in installing the
equipment as well as its continuing service agreements with the subscribers. That
the plaintiff could have done better, or even that it did do better in its dealing with
other DirecTV affiliates is not the point.

Moreover, what appears to be plaintiff's alternative argument for unjust
enrichment, that defendant also cheated him by failing to credit him properly with
the discounts he had been promised is also unconvincing. In this regard also
plaintiff's testimony fails to establish with any specificity to what extent in any
given instance he was deprived of the discounts that he claims he was promised.
His testimony was vague and inconsistent. He speaks only in generalities. His
claim that defendants failed to properly account for his credits is directly
contradicted by defendant's witnesses. His testimony that NACE refused to
provide him with proper documentation regarding his credits and discounts for
years, yet he continued to do business with NACE, is contrary to common sense
and inconsistent with plaintiff's other actions. For example, when he had difficulty
receiving his payments from Pace, he moved his accounts to NACE to remedy that

situation. He was aware of and simultaneously doing business with other DirecTV affiliates to whom he could have taken his accounts. Shortly after commencing to install SMATV equipment with NACE, he was, in spite of the claimed deficiency of documentation from NACE, able to determine precisely how much NACE was charging him to install the necessary head end equipment and quickly determined it would be more profitable for him to do the work himself. He had no difficulty informing NACE that he no longer needed their services in this regard thereby increasing his own profits in future subscriptions. He also had no difficulty doing business with and reaching agreements with other affiliates. During this same time period he entered into a detailed, comprehensive written agreement with NACE regarding compensation for USA Satellite's MDU accounts which included specific detailed provisions for calculating all forms of compensation he was to receive including express provisions for the payment of standard prepaid commissions, premier prepaid commissions and residual commissions. When asked why he did not include his SMATV accounts in this detailed contract, Harmelech's only response was to deride the written agreement's importance referring to it as "mumbo jumbo." In short, his contention that he was unfairly duped for years by NACE's improper and insufficient documentation was simply not credible.

 

The Court finds plaintiff, USA Satellite & Cable, Inc. has failed to meet its burden of proof and enters judgment for the defendant, North American Cable Equipment, Inc. and terminates the case.

Dated: January 18, 2012

**SO ORDERED**                    **ENTER:**

----------------------------------------------
            **RONALD A. GUZMÁN**
              **District Judge**